**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

JONATHAN GIBSON,

    Plaintiff,

v.

UNIVAR USA INC.

    Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Jonathan Gibson ("Plaintiff" or "Gibson"), through his attorneys, the Traylor Law Group, LLC, submits the following Complaint and Jury Demand ("Complaint") against Defendant Univar USA Inc. ("Defendant" or "Univar"):

**PARTIES AND JURISDICTION**

1. Plaintiff is an individual resident of Colorado, residing in the City of Aurora, State of Colorado.

2. Upon information and belief, Defendant Univar is a Washington corporation authorized to do business in Colorado, with its principal place of business located 3075 Highland Parkway, Suite 200, Downers Grove, IL 60515.

3. At all relevant times, Defendant employed Plaintiff at its Denver location, 4300 Holly Street, Denver, Colorado, 80216.

4. At all relevant times, Defendant was Plaintiff's "employer" as defined by 42 U.S.C. § 2000e(b), and employed the requisite number of employees.

1

5. Subject matter jurisdiction over this action is invoked pursuant to 28 U.S.C. § 1331. This action is instituted pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

6. Venue in the State of Colorado is proper pursuant to 28 U.S.C. § 1391(b), because the unlawful employment practices alleged herein were committed within the State of Colorado.

7. All administrative prerequisites for the filing of this Complaint have been met. Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a Determination and Notice of Right to Sue on or around November 3, 2016.

## FACTUAL ALLEGATIONS

8. Mr. Gibson began working for Univar as a Material Handler in March 2014.

9. Defendant is a national chemical distributor.

10. Plaintiff is an African-American.

11. Within the first few months of his employment, Plaintiff's co-workers started to make offensive jokes and comments about his race.

12. The incidents increased in severity and frequency during the following months. The harassment towards Mr. Gibson was primarily focused on his race. Mr. Gibson largely tried to ignore the behavior, but it continued. On several occasions Plaintiff told his co-workers that he did not like the jokes and asked them to stop. They did not.

13. In early 2015, a Human Resources Representative came to Defendant's Denver location. Plaintiff informed her of the racial harassment he was experiencing. Defendant's

Human Resource Representative indicated that she would address his concerns. She did nothing and Plaintiff never heard from her again. The harassment continued.

14. In January 2016, Mr. Gibson injured his back on the job. Within a few days, his physician released him to work, with various restrictions on the physical tasks he could perform. Plaintiff's supervisor refused to let Mr. Gibson return to work unless he had no restrictions. Plaintiff missed several months of work, until he was fully released in April 2016.

15. When Mr. Gibson returned after his injury, he was placed on a different crew. The new crew harassed Mr. Gibson even more severely, with particular focus on his race. The crew ranged in size from approximately five to eight people, and nearly all of them made racially insulting remarks to Mr. Gibson, often in the presence of Plaintiff's supervisor, William Bell ("Bell").

16. The harassment was even worse during the 30-minute period each day when Mr. Gibson's crew overlapped with another crew. They made many racially hostile and offensive comments and actions. Below is a sampling of the racially hostile conduct:

   a. After Mr. Gibson failed to catch an object thrown to him, a co-worker said, "You're black, you should be able to catch boy. Maybe I should draw some football stripes on it."

   b. Another employee said, in front of Mr. Gibson, "If black people evolved from monkeys, then how come monkeys have a superior intellect?"

   c. When a helicopter passed over, a co-worker said to Mr. Gibson, "You better run, I know they're looking for you," implying that Mr. Gibson is a criminal. Another said, "Hey Jon, come stand over here by me so I can use the helicopter's spotlight to load this truck."

   d. After a co-worker's girlfriend apparently broke up with him, he stated it was "because of Jon" that he did not have a girlfriend. When Mr. Gibson asked what he meant, the co-worker said it was "because you black guys and your big ol' cocks that she ran off. So just throw it over your shoulder and go home."

3

e. Mr. Gibson's co-workers also made numerous comments about his girlfriend, who is also African-American. For example, one employee claimed that Mr. Gibson's back pain was not the result of his injury in January, but instead from the "young chocolate pussy [he had] at home." Another time, the employee said, "How's that adolescent vagina you're bangin? I bet she keeps it shaved looking like toddler pussy."

f. One of Mr. Gibson's co-workers drew several sketches at work depicting African-Americans in an offensive and cartoonish manner, with absurdly large lips and Afros. Another drawing depicted Fat Albert and suggested that he was illiterate.

g. Several co-workers frequently referred to Mr. Gibson as "the black shit" of the crew.

h. Mr. Gibson's co-workers would call him "my nigga" or "homie."

17. Mr. Gibson repeatedly asked his co-workers to stop their racist behavior, but they laughed off his requests. Mr. Gibson told his supervisor on several occasions, that their harassment was bothering him and affecting his safety, but he too discounted Mr. Gibson's complaints, stating that they were "just giving [Mr. Gibson] a hard time."

18. In late-July 2016, Plaintiff called and made another complaint to a Human Resource Representative about the situation. The representative told him she would look into the situation, but Mr. Gibson did not hear anything for several days. As a result, he told the Branch Operations Manager, Dave Hutchinson, that he would not return to work until his concerns were addressed.

19. Finally, on August 2, 2016, another HR representative, Christine Zapata, came to the site to conduct an investigation. After meeting with Plaintiff and other employees about the situation, she simply had each member of the crew sign a document stating that they would not engage in further harassment of any kind. However, upon information and belief, not a single employee was disciplined for this behavior.

4

20. Defendant's weak response to Plaintiff's repeated complaints did not stop the harassment. In fact, the harassment escalated significantly, and Mr. Gibson's co-workers began retaliating against Plaintiff for his complaints.

21. Because of his complaint to Human Resources, his entire crew called him a "snitch," and they frequently commented that he had "HR on speed dial."

22. The "investigation" by Human Resources seemed to cause Plaintiff's co-workers to get more aggressive with their harassment. For example, one employee said to Mr. Gibson and others, "I don't care who comes up here. If I want to be racist, I'll be racist. No one can tell me how to feel. Ain't that right Jon?"

23. Some of this retaliation occurred in front of the Branch Operations Manager, Mr. Hutchinson, who did nothing to stop it. Plaintiff's supervisor would sometimes tell the employees to "cut it out," and he would remind the crew to be careful when HR or other management employees were around, but he never disciplined anyone for this behavior.

24. In addition to the increased hostility resulting from Plaintiff's complaint, Mr. Gibson's co-workers actually began to refuse to help him with basic tasks that required multiple people, creating an inevitably unsafe situation.

25. In August 2016, one of Plaintiff's co-workers overloaded a tanker with caustic soda, causing the chemical to spray out of the tanker. Plaintiff witnessed this burst and quickly reacted to the situation by running to the pump to turn it off. In the process, Mr. Gibson's face, eyes and neck were sprayed with caustic soda, which immediately impaired his vision and caused significant pain. At least two other employees witnessed this injury, but consistent with their inappropriate treatment of Mr. Gibson, they made no attempt to help him.

26. Plaintiff had to awkwardly get himself to the eye wash with severely limited vision, and it took nearly *two hours* before anyone offered to take him to the hospital. Mr. Gibson was diagnosed with conjunctivitis due to chemical exposure and later prescribed medication for his injuries. Plaintiff's doctor also excused him from work for three days for his eyes to recover.

27. While Plaintiff was out of work and unpaid, his supervisor contacted him demanding to see the paperwork related to his injury, allegedly to make sure that Mr. Gibson's hospital bills were paid. Plaintiff complied and his mother and girlfriend drove him to the branch because he was medicated and unable to drive.

28. When he arrived, he was interrogated about the incident that caused his injuries by various managers and three men he did not recognize and who did not introduce themselves. The obvious intent of the interrogation was to blame Plaintiff for the incident. Plaintiff was not permitted to clock in for this meeting, and therefore, ultimately removed himself in light of the obvious malicious intent of Defendant in calling the meeting.

29. The following day, August 31, 2016, Plaintiff was informed him that he was being suspended indefinitely, without pay, for leaving the meeting the day before.

30. On September 6, 2016, Mr. Gibson was summoned to another meeting. He was questioned about why he left the meeting on August 30 and other issues about his injuries. Plaintiff explained that he did not think he was required to stay because he was on medical leave and he was having difficulty being in such an intense meeting because of his medication.

31. On September 9, 2016, Plaintiff was informed he was being terminated, allegedly for leaving the safety meeting.

## FIRST CLAIM FOR RELIEF
### (Violation of 42 U.S.C. § 2000e, et. seq.)

32. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

33. The unlawful employment practices alleged herein were and are committed within the State of Colorado.

34. For all relevant periods to this legal action, Defendant has been continuously engaged in an industry affecting commerce within the meaning of Section 701(b),(g) and (h) of Title VII.

35. Defendant has intentionally engaged and continues to engage intentionally in unlawful employment practices and policies in violation of Section 703 of Title VII, and the 1991 Civil Rights Act.

36. Plaintiff is an African-American male.

37. Plaintiff's co-workers continuously harassed him based on his race by making derogatory comments and drawings to him and about him.

38. Plaintiff's co-workers refused to assist Plaintiff when handling dangerous chemicals, despite company policy requiring it. Defendant's employees refused to assist Plaintiff after he was severely injured.

39. The various derogatory comments and drawings were directed to Plaintiff because of his race and color.

40. These actions were severe, pervasive and ongoing. These actions created an intimidating, hostile and offensive working environment for Mr. Gibson.

41. The actions of Defendant's employees were offensive and unwelcome.

42. Defendant's management was aware of the offending conduct, but never rectified the racially hostile environment.

43. Defendant's violation of Title VII, including maintaining policies and practices which discriminate against Plaintiff, has caused Plaintiff and will continue to cause him damages in an amount to be proven at trial, including lost wages and employee benefits, severe emotional distress, mental anguish and loss of enjoyment of life.

44. Defendant has acted willfully and wantonly, or with reckless disregard for Plaintiff's rights, entitling him to an award of punitive damages.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of 42 U.S.C. § 2000e, et. seq.)

45. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

46. Plaintiff engaged in activity protected by Title VII on multiple occasions. Specifically, he opposed discriminatory and retaliatory practices and conduct directed at him by Defendant's employees and managers, including discrimination and harassment based on his race.

47. As a result of Plaintiff's protected opposition to discrimination and harassment, Defendant began a pattern of retaliatory conduct against Plaintiff by subjecting him to the different terms and conditions of employment described in this Complaint.

48. Defendant ultimately terminated Plaintiff because of his protected activities.

49. Plaintiff has suffered, and continues to suffer, damages as a result of Defendant's retaliatory conduct.

50. Defendant's conduct was engaged in with malice or with reckless indifference to Plaintiff's federally protected rights.

## THIRD CLAIM FOR RELIEF
### (Violation of 42 U.S.C. § 1981, et. seq.)

51. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

52. The unlawful employment practices alleged herein were and are committed within the State of Colorado

53. Plaintiff is an African-American male.

54. Plaintiff's co-workers continuously harassed him based on his race by making derogatory comments and drawings to him and about him.

55. Plaintiff's co-workers refused to assist Plaintiff when handling dangerous chemicals, despite company policy requiring it. Defendant's employees refused to assist Plaintiff after he was severely injured.

56. The various derogatory comments and drawings were directed to Plaintiff because of his race and color.

57. These actions were severe, pervasive and ongoing. These actions created an intimidating, hostile and offensive working environment for Mr. Gibson.

58. The actions of Defendant's employees were offensive and unwelcome.

59. Defendant's management was aware of the offending conduct, but never rectified the racially hostile environment.

60. Defendant's violation of 42 U.S.C. 1981, including maintaining policies and practices which discriminate against Plaintiff, has caused Plaintiff and will continue to cause him

damages in an amount to be proven at trial, including wages, employee benefits, severe emotional distress, mental anguish and loss of enjoyment of life.

61. Defendant has acted willfully and wantonly, or with reckless disregard for Plaintiff's rights, entitling him to an award of punitive damages.

### FOURTH CLAIM FOR RELIEF
**(Retaliation in Violation of 42 U.S.C. § 1981, et. seq.)**

62. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

63. Plaintiff engaged in protected activity on multiple occasions. Specifically, he opposed discriminatory and retaliatory practices and conduct directed at him by Defendant's employees and managers, including discrimination and harassment based on his race.

64. As a result of Plaintiff's protected opposition to discrimination and harassment, Defendant began a pattern of retaliatory conduct against Plaintiff by subjecting him to the different terms and conditions of employment described in this Complaint.

65. Defendant ultimately terminated Plaintiff because of his protected activities.

66. Plaintiff has suffered, and continues to suffer, damages as a result of Defendant's retaliatory conduct.

67. Defendant's conduct was engaged in with malice or with reckless indifference to Plaintiff's federally protected rights.

**WHEREFORE**, Plaintiff respectfully prays for judgment in his favor and against Defendant as follows:

A. Enter judgment that the practices complained of herein are unlawful and violative of federal law;

B. Compensate and make whole Plaintiff for all earnings, wages, and other benefits he would have received but for Defendant's wrongful actions, including but not limited to back pay, front pay, compensatory, and all other damages allowable by law;

C. Compensate and make whole Plaintiff for all loss of earning power and diminished reputation;

D. Compensate and make whole Plaintiff for damages for emotional distress, personal humiliation, and loss of enjoyment of life;

E. Award Plaintiff the costs and disbursements of this action, including reasonable attorney's fees and expert witness fees;

F. Award Plaintiff punitive damages allowable by law;

G. Award Plaintiff interest, pre- and post-judgment; and

H. Award Plaintiff such further relief as the Court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL.**

DATED this 1st day of February, 2017.

Respectfully submitted,

**TRAYLOR LAW GROUP, LLC**

*s/ Whitney Traylor*
Whitney C. Traylor
Craig T. Truitt
1721 High St.
Denver, CO 80218
Telephone: 303-321-1862
Facsimile: 303-837-1214
wtraylor@traylorlawgroup.com
ctruitt@traylorlawgroup.com

**ATTORNEYS FOR PLAINTIFF**

PLAINTIFF'S ADDRESS:
14159 E. Kentucky Pl. Apt. #23-104
Aurora, CO 80012